# EXHIBIT B

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

CAMAC FUND L.P.,                        :
                                        :
               Plaintiff,               :
                                        :
          v.                            :   C.A. No.
                                        :   2023-0817-MTZ
PAUL A. WAGNER, LAWRENCE EICHENFIELD,   :
BARBARA K. FINCK, DONALD A. WILLIAMS,   :
STEPHEN K. DOBERSTEIN, STEVEN           :
KORNFELD, SCOTT BRUN, DAVID GRYSKA,     :
FRED ALGER MANAGEMENT, LLC, BVF         :
PARTNERS L.P., FARALLON CAPITAL         :
MANAGEMENT, L.L.C., PERCEPTIVE          :
ADVISORS LLC, and TYBOURNE CAPITAL      :
(US) LLC,                               :
                                        :
               Defendants.              :
                                        :
          and                           :
                                        :
FORTE BIOSCIENCES INC., a Delaware      :
corporation,                            :
                                        :
               Nominal Defendant.       :

                    Chambers
                    Leonard L. Williams Justice Center
                    500 North King Street
                    Wilmington, Delaware
                    Monday, April 15, 2024
                    3:15 p.m.

               - - -
BEFORE:  HON. MORGAN T. ZURN, Vice Chancellor
               - - -

 THE COURT'S RULING ON DEFENDANTS' MOTION TO DISMISS

------------------------------------------------------------
              CHANCERY COURT REPORTERS
          Leonard L. Williams Justice Center
              500 North King Street
          Wilmington, Delaware 19801
              (302) 255-0521

2

1    APPEARANCES: (via telephone)

2            WILLIAM M. ALLEMAN, JR., ESQ.
             Meluney Alleman & Spence, LLC
3                   -and-
             WILLIAM SPRUANCE, ESQ.
4            Morris Kandinov LLP
                    -and-
5            AARON MORRIS, ESQ.
             ANDREW W. ROBERTSON, ESQ.
6            of the New York Bar
             Morris Kandinov LLP
7              for Plaintiffs

8            SHANNON E. GERMAN, ESQ.
             JEREMY W. GAGAS, ESQ.
9            KAITLIN E. MALONEY, ESQ.
             NORA M. CRAWFORD, ESQ.
10           Wilson Sonsini Goodrich & Rosati, P.C.
               for Defendants and Nominal Defendants

11

12                          -  -  -

13

14

15

16

17

18

19

20

21

22

23

24

3

1              THE COURT:  Good afternoon.  This is

2    Morgan Zurn.  May I have appearances, please,

3    beginning with counsel for the plaintiffs.

4              ATTORNEY ALLEMAN:  Good afternoon,

5    Your Honor.  This is Bill Alleman on behalf of the

6    plaintiff, Camac Fund, L.P.  I'm joined today by my

7    co-counsel, Aaron Morris, Andrew Robertson, and

8    William Spruance of Morris Kandinov LLP.

9              THE COURT:  Thank you.

10              And counsel for the defendants?

11              ATTORNEY GERMAN:  Good afternoon, Your

12    Honor.  Shannon German of Wilson Sonsini on behalf of

13    the defendants.  My colleagues, Kaitlin Maloney, Nora

14    Crawford, and Jeremy Gagas, are on with me as well.

15              THE COURT:  Thank you.

16              I do have a bench ruling to deliver.

17    It is somewhat lengthy, so if you could mute your

18    lines and make a cup of tea or what have you, I will

19    start straight away.  I apologize for the format of

20    this.  It is easier for me to get to the answers

21    sooner, which is, I'm assuming, what you would like,

22    on balance.

23              If you could mute your lines, please.

24              Plaintiff has offered detailed

CHANCERY COURT REPORTERS

4

1  allegations describing a clinical-stage

2  biopharmaceutical company having announced the failure

3  of its lead program in clinical trials, then pivoting

4  to developing a new compound, which drew strong

5  opposition from activist investors seeking

6  liquidation.

7        The company then initiated various

8  defensive mechanisms, culminating in an unlawfully

9  delayed annual meeting and an equity issuance that

10  pre-ordained the meeting's results.  To paraphrase

11  *Kellner*, this transaction "was not adopted on a clear

12  day.  The skies were overcast ..., with storm clouds

13  of [stockholder activism] gathering on the horizon."

14  And so, enhanced scrutiny "with sensitivity to the

15  stockholder franchise" is warranted; and I must deny

16  the defendants' motion to dismiss, for reasons that I

17  will explain.

18        First, the background, which is

19  somewhat lengthy, given the importance of the facts.

20  Forte Biosciences, Inc. is a clinical-stage

21  biopharmaceutical company that went public in June of

22  2020.  At the time of its public offering, Forte

23  announced it was focused on advancing through clinical

24  trials its lead product candidate, FB-401.  But by

5

1  September 2, 2021, the Company announced that FB-401

2  had failed in the second phase of its clinical trials,

3  and that Forte discontinued its development.

4              The Company's stock price collapsed

5  from a high of $31.47 per share on September 2 to

6  $4.91 the following day.  Forte's stock price

7  continued to drop through the year.  By the end of

8  2021, it had declined by 85% and was trading

9  significantly below its cash value

10             While Forte's stock price dropped, its

11 coffers were full.  As of December 31, 2021, Forte had

12 retained $42 million in cash and cash equivalents.  At

13 the end of the first quarter for 2022 and again in

14 May, Forte's board of directors reviewed and discussed

15 the Company's cash runway projections through the end

16 of 2022 but, according to plaintiffs, did not express

17 any need for additional cash.

18             Yet on March 31, Forte entered into an

19 at-the-market sales agreement that gave the Company

20 the ability to issue up to $25 million of new common

21 stock to the market, if needed.  The Company

22 simultaneously filed a prospectus supplement covering

23 sales of up to $7 million

24             In a May 16 press release, Forte

6

1    announced "that the Board had determined to 'embark on

2    a new path [to] develop novel compounds for the

3    treatment of autoimmune diseases" with a molecule

4    referred to as "FB-102."  Forte further announced "at

5    the time of the pivot" that it held "over $40 million

6    in cash on its balance sheet" and projected "[the

7    cash] [wa]s sufficient to fund operations for at least

8    the next 24 months," which took into account "research

9    and development costs" and costs relating to

10   "preclinical studies" and "clinical trials."  Those

11   propositions come from paragraphs 30 and 48 of the

12   Amended Complaint.

13              Immediately following Forte's May 16

14   announcements, various stockholders expressed their

15   dissatisfaction with the FB-102 pivot and their

16   preference for a liquidity event.

17              On May 24, a holder of 8.94% of

18   outstanding shares, BML Capital Management, disclosed

19   that it emailed Defendant Wagner, Forte's founder,

20   CEO, and Chairman of the Board, stating that the

21   Company should liquidate and return cash to

22   shareholders, "noting the Company is being run for the

23   benefit of the few remaining employees rather than

24   shareholders."

7

1          On July 5, a holder of 7.5% of

2   outstanding shares, Funicular Funds, LP, disclosed it

3   had a "frank exchange of views with [Wagner].  Among

4   other things, [Funicular] ... Requested ... the return

5   of capital to shareholders" and suggested the Board

6   evaluate "a tender offer or other extraordinary

7   transaction to return $20 million (or such other

8   amount deemed appropriate under the circumstances) and

9   promptly report back to holders."

10          Days later, on July 11, Forte

11   announced a rights plan with a 10% threshold, with

12   "[o]ne of the ... triggers [being] the public

13   announcement of a tender offer."  The Board disclosed

14   the rights plan "was intended to 'render [it] more

15   difficult or [to] discourage a merger, tender or

16   exchange offer or other business combination involving

17   the Company that is not approved by the Board."

18          Unfazed, Funicular disclosed on July

19   19 that "its holdings in Forte had increased to 9.9%

20   of [the] outstanding shares" and criticized Forte for

21   the rights agreement.  It publicly opined that "a

22   'hostile' party could conceivably ... purchase

23   [Forte's] entire capital stock at a discount

24   liquidation value while still offering stockholders a

8

1  very substantial premium" and concluded "[t]he Board

2  no doubt fe[lt] compelled to substitute its judgment

3  for stockholders'."

4              Other stockholders quickly joined

5  Funicular's remonstrations.  Just a few weeks after

6  Funicular's filing, on August 1, Camac Fund, or

7  "Plaintiff" here, filed a Schedule 13D disclosing it

8  held an approximately 7.5% stake in Forte.  A few days

9  after that, on August 4, ATG Capital Management, LLC,

10  disclosed its 9.9% stake.

11              ATG publicly stated its

12  dissatisfaction with Forte's strategic direction,

13  including Forte's introduction of the rights plan.

14  And it also voiced an intention "to engage in

15  discussions with [Forte's] management, board of

16  directors, [and] other representatives ... regarding

17  potential alternatives and recommendations ... for

18  more immediate and certain value creation ...

19  includ[ing], without limitation, liquidation of

20  [Forte's] assets and return of capital to the Issuer's

21  stockholders."

22              Five days later, Camac amended its

23  Schedule 13D to disclose it had acquired 9.8% of the

24  Company's outstanding stock.

9

1          Thus, by August, the Forte Board knew

2    that at least 38.5% of its outstanding shares were

3    held by sophisticated investors who shared the goal of

4    liquidation.

5          On August 11, the Board met and

6    "discussed 'current ownership and the on-going demands

7    from certain shareholder activists to liquidate the

8    Company.'"

9          On August 15, Forte disclosed that

10   from July through August, it had "issued an additional

11   5.6 million shares of common stock, which I'll call

12   the "August Offering," amounting to roughly 38% of

13   then-outstanding shares, an almost exact echo of the

14   total shares held by the known stockholder activists.

15         The August Offering yielded

16   "approximately $7.0 million" in gross proceeds for the

17   Company, and the Company's management advised the

18   Board that Forte had at least a 24-month cash runway

19   following the recent financing transactions.

20         On August 18, Camac disclosed the

21   August Offering had diluted its stake in Forte from

22   9.8% to 7.1%.  Camac also publicly announced its

23   "concern regarding the Board's decision to issue a

24   substantial number of shares of Common Stock, thereby

10

1  diluting the number of shares of [Camac] and other

2  holders" and its intention to "take action against the

3  Board if necessary."

4                    One week later, Camac served Forte

5  with a books and records inspection demand, citing

6  mismanagement and the suitability of the incumbent

7  directors.

8                    In September, Camac disclosed it owned

9  approximately 8.2% of Forte's outstanding common

10 stock.

11                    On October 20, the Company agreed to

12 produce certain corporate records, and on November 8,

13 the Company and Camac entered into a confidentiality

14 agreement, but the Company did not make a production.

15 Camac turned to this Court on November 23, and

16 eventually received the documents it was seeking.

17                    In the meantime, on November 14, the

18 Board disclosed it was expanding in size and

19 appointing Scott Brun to a three-year term. The Board

20 then disclosed "it had adopted generous severance

21 agreements with the Company's officers in the event of

22 a change of control."

23                    On January 10, 2023, the Board

24 announced it was expanding again and appointed David

11

1    Gryska to the Board.  Because the Company's director

2    elections were staggered, the Brun and Gryska

3    appointments ensured the incumbents would retain

4    control even if they suffered two consecutive losses

5    in 2023 and 2024.

6              One month later, Camac nominated two

7    candidates against incumbents Wagner and Eichenfield

8    in the 2023 election.  Camac had support, and the

9    Board was aware Camac's candidates were expected to

10   succeed over the incumbent directors.

11             The Board stated, through counsel,

12   that it would immediately reappoint Defendant Wagner

13   even if he were to lose his reelection bid at the 2023

14   meeting.

15             Camac and Forte engaged in more

16   serious discussions through March.  Camac suggested

17   multiple compromises, but the Board did not accept

18   Camac's suggestions.

19             In May, Forte released its first

20   quarter results and projected that "its current cash

21   available w[ould] enable it to fund its operating

22   expenses and capital expenditure requirements through

23   at least twelve months."  And, Forte further expressed

24   that its "future capital requirements" included

12

1  "clinical trials for [its] product candidates."

2            Meanwhile, Camac continued its

3  election campaign, filing a preliminary proxy

4  statement soliciting votes for its candidates on May

5  25.  Camac's proxy statement levied several

6  accusations against Forte's leadership, declaring that

7  (i) "management and the Board have a track record of

8  value destruction, [ii] are pursuing value destructive

9  initiatives, and [iii] are disregarding stockholders'

10 interests."

11           Camac flexed its voting power,

12 identifying itself as "one of the largest stockholders

13 of the Company" and disclosing it "ha[d] been

14 approached by numerous significant stockholders, all

15 of whom indicated that management ha[d] been unwilling

16 to speak with them."

17           It concluded that a change of the

18 Board was necessary for protecting Company and

19 stockholder interests and that "the removal of the two

20 incumbent directors, particularly [the founder and]

21 CEO, Dr. Wagner, [would] ... send a clear message to

22 the Company's leadership that the status quo is not

23 acceptable[,] and stockholders demand a change in

24 direction."

13

1          The time to announce a properly timed

2    annual meeting passed with no announcement.  On June

3    26, the Board disclosed it was extending the rights

4    plan from July 2023 through July 12, 2024.  It also

5    announced the 2023 annual meeting would take place on

6    September 19, 15 months after the 2022 annual meeting,

7    but it did not set the election's record date for the

8    2023 annual meeting.

9          Then, on August 1, the Board announced

10   a private investment in public equity plan, the

11   "PIPE."  Under the PIPE, Forte sold 15.2 million

12   shares of common stock, comprising 71% of

13   then-outstanding common stock, as well as 9.7 million

14   warrants to purchase common stock.

15         The nine PIPE investors were selected

16   by Wagner.  They included four Board members.  After

17   consummating the PIPE, Forte then set the 2023

18   election's record date as August 10.  Of the 36.2

19   million shares allowed to vote in the election, 15.2

20   million had been issued in the PIPE, i.e., 42% of

21   outstanding shares.

22         On August 10, Camac sued Forte's eight

23   directors for breach of fiduciary duty and the five

24   nondirector PIPE investors for aiding and abetting,

14

1  and sought expedition to facilitate enjoining the PIPE

2  shares from being voted at the election.

3  On August 17, "the Court granted

4  expedition but declined to set a schedule for

5  resolution of the matter prior to the September 19,

6  2023 Annual Meeting."  The parties agreed to stay this

7  action pending the results of the election.

8  Leading up to the September 19

9  election, several prominent Forte stockholders

10 announced their support for Camac's nominees and their

11 grievance with the rights plan, the August Offering,

12 and the PIPE.

13 At the election, the PIPE votes were

14 dispositive.  Without the PIPE votes, Wagner and

15 Eichenfield would have lost their seats.  With the

16 PIPE votes, they kept their seats. And without the

17 PIPE votes, Funicular's proposal to ask the Board to

18 terminate the rights plan would have passed.  With the

19 PIPE votes, that proposal was rejected.

20 This action resumed two days after the

21 election with the defendants filing their opening

22 brief in support of their motion to dismiss.  Camac

23 responded by filing an amended complaint on October 23

24 that dismissed the five PIPE investors.

15

1    Camac's claims for breach of fiduciary

2    duty and dilution against Forte's directors stem from

3    the Board's implementation of the PIPE.  Forte asks

4    this Court to (i) scrap the 2023 election results and

5    instate the pre-PIPE 2023 results, (ii) set the 2024

6    annual meeting within 13 months of the 2023 meeting,

7    and (iii) exclude all PIPE votes from the 2024

8    director elections.

9    Defendants moved to dismiss the

10   amended complaint under Rules 12(b)(6) and Rule 23.1,

11   and the parties briefed that motion.  I heard oral

12   argument on February 14 and took the matter under

13   advisement.  For the reasons I'll explain, Defendants'

14   motion is denied.

15   Plaintiff's Count I, pled as a direct

16   claim, asserts Forte's directors breached their

17   fiduciary duties because the PIPE is an entrenching

18   action that interfered with Plaintiff's right to vote.

19   Defendants first assert this claim is actually

20   derivative and must be dismissed under Rule 23.1 for

21   failure to plead demand futility, then they attack its

22   merits under Rule 12(b)(6).  Both arguments fail to

23   secure a dismissal.

24   First, defendants contend Count I must

16

be dismissed under Rule 23.1 for failure to plead a litigation demand on the board was futile.  According to Defendants, Count I's "allegations and claimed harm" are actually derivative.  Not so.  Count I is properly direct.

When determining whether a claim is direct or derivative, courts "look to the nature of the wrong and to whom the relief should go."  That's the familiar *Tooley* test.  "The analysis must be based solely on the following questions:  Who suffered the alleged harm — the corporation or the suing stockholder individually — and who would receive the benefit of the recovery or other remedy?"

A wrong to a stockholder's legal rights as a stockholder is distinct from an injury caused to the corporation alone.  In such individual suits, the recovery or other relief flows directly to the stockholders, not to the corporation.

In other words, if a stockholder demonstrates that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation, then, that claim is direct, not derivative.

It is well established that, to quote

17

1   *MultiPlan*, "Delaware courts regard 'a wrongful

2   impairment by fiduciaries of the stockholders' voting

3   power or freedom' as causing 'a personal injury to the

4   stockholders, not the corporate entity."

5                    Defendants' argument that Count I is

6   derivative depends on recasting the Plaintiff's claim

7   about the PIPE's effects on its voting rights as a

8   dilution claim.  But Plaintiff brought a derivative

9   dilution claim in Count II.  Count I plainly complains

10  of a direct harm to its voting rights.  Plaintiff's

11  Count I could prevail without Plaintiff showing any

12  injury to the corporation, and it is properly

13  presented as a direct claim.

14                   Defendants also contend Count I fails

15  to state a claim on which relief can be granted

16  because the PIPE's implementation should be subject to

17  business judgment review.

18                   The standards governing a motion to

19  dismiss under Rule 12(b)(6) for failure to state a

20  claim for relief are well settled and familiar.  I

21  will not repeat them here.

22                   The business judgment rule is

23  Delaware's default standard of review. It presumes

24  that when directors of a corporation make a business

18

1    decision, they acted on an informed basis, in good

2    faith, and in the honest belief that the action taken

3    was in the best interests of the company.  It is

4    "something as close to non-review as our law

5    contemplates," with irrationality as its outer limit.

6              Thus, when the business judgment rule

7    applies, "[d]irectors' business decisions will not be

8    disturbed if they can be attributed to any rational

9    business purpose."  Those standards come from *New*

10   *Entertainment Associates v. Rich* and *Brehm v. Eisner*.

11   Claims challenging those decisions will be dismissed.

12             But certain scenarios inspire "the

13   need to take a more direct role in overseeing the

14   actions of the board," to quote *Ryan v. Armstrong*.

15   One such scenario is "where ... the board takes

16   defensive action in response to a threat to the

17   board's control of the corporation's business and

18   policy direction," to quote *Kahn v. Roberts*.

19             The Delaware Supreme Court recognized

20   this scenario warranted review for reasonableness in

21   *Unocal Corp. v. Mesa Petroleum* and recently addressed

22   that enhanced scrutiny as "applied with sensitivity to

23   the stockholder franchise" in *Coster v. UIP Companies*.

24             *Coster* explains that "in the context

CHANCERY COURT REPORTERS

19

1  of a corporate election or stockholder vote" involving

2  "control of the corporation's business and policy

3  direction," "the board must identify a legitimate

4  threat and then 'tailor its response to only what is

5  necessary to counter the threat,'" and its "response

6  'cannot deprive the stockholders of a vote.'"

7          Likewise, the Court is charged to

8  undertake a two-fold inquiry that mirrors the Board's

9  requirement:  First determining whether the board

10  faced a threat to an important corporate interest; and

11  second, reviewing whether the defensive measures were

12  reasonable in relation to the threat.  And, this

13  "inquiry [will] be undertaken 'with a special

14  sensitivity' where directors' actions may affect the

15  stockholder franchise or the result of director

16  elections," to again quote *Coster*.

17          *Unocal* enhanced scrutiny attaches to

18  board action when the complaint alleges "threatened

19  external action from which it could reasonably be

20  inferred that the defendants acted defensively," to

21  quote *Gantler*.

22          "Absent an actual threat to corporate

23  control or action substantially taken for the purpose

24  of entrenchment, the actions of the board are judged

20

1  under the business judgment rule," to quote *Ryan v.*

2  *Armstrong*.

3              To secure enhanced scrutiny, Plaintiff

4  must plead facts that show the "board perceive[d] a

5  threat to control and t[ook] defensive measures in

6  response to the threat," again quote *Ryan*.

7              "First, the court must determine

8  whether the board faced a threat 'to an important

9  corporate interest or to the achievement of a

10  significant corporate benefit,'" to quote Berger v.

11  Adkins.

12              Defendants assert Plaintiff has failed

13  to allege a perceived threat because the 2023 election

14  for two of eight board seats did not threaten a loss

15  of majority control.  But a legally cognizable threat

16  can be less than an immediate coup of the entire

17  board.

18              In *Strategic Investment Opportunities*

19  *v. Lee Enterprises*, this Court applied enhanced

20  scrutiny where the incumbents risked losing a minority

21  of their seats.  *Williams* noted *Third Point* found a

22  cognizable threat in the context of a proxy contest to

23  replace three incumbents on Sotheby's twelve-person

24  board.  And a creeping, anticipatory, or incremental

21

1  threat can suffice, as it did in *Ryan v. Armstrong*, *In*

2  *re Ebix*, and of course *Moran*.

3          In *Third Point LLC v. Ruprecht*, the

4  simultaneous accumulation of stock by several activist

5  hedge funds on a relatively rapid basis constituted a

6  legally cognizable threat of "creeping control"

7  towards a control block obtained without paying a

8  control premium, even in electoral circumstances that

9  did not support an inference of entrenchment.

10          In *Yucaipa v. Riggio*, the Court held

11  that the likelihood of a proxy contest not only

12  constituted a threat but meetings and collaborative

13  rapport between significant investors supported an

14  inference that the directors had reason to be

15  concerned the two investors would combine forces to

16  influence the entity's business.

17          Here, Plaintiff has pled facts

18  warranting a pleading-stage inference that Forte's

19  Board perceived a threat to control.  As in *Third*

20  *Point* and *Yucaipa*, several stockholder activists were

21  simultaneously accumulating Forte shares.  From May

22  through August, activist stockholders cumulatively

23  acquired 38.50% of Forte's shares, unthwarted by the

24  July 11 rights plan with its 10% threshold.

22

1          Camac persisted in acquiring stock

2   after the dilutive August Offering.  As in *Yucaipa*,

3   the activists consistently presented a united front,

4   publicly sharing common goals and representative

5   advocacy.

6          Camac expressly alluded to activist

7   stockholder unity in its May 25 Schedule 14A,

8   referencing the "four Schedule 13D filers" and their

9   "adverse reactions ... regarding the Company's current

10  strategy and widespread interest ... for the Company

11  to abandon its current strategy and return capital to

12  stockholders."

13         Several months before the Board issued

14  the PIPE, the Board knew Camac had "been approached by

15  numerous significant stockholders."  And those

16  stockholders shared a unified message rebuking the

17  Forte Board and calling for a change in leadership and

18  corporate policy.

19         Camac nominated two dissident Board

20  candidates and proclaimed that a vote for the Camac

21  candidates is a vote against "the status quo" and is a

22  "demand [for] a change in direction."

23         It is reasonably inferable the Board

24  would be concerned Camac and its band of unified

23

1    stockholders were capable of and interested in a joint

2    effort to force a liquidation.  And it is reasonably

3    conceivable Forte's Board perceived a threat to

4    corporate control and policy by the creeping control

5    of its activist stockholders and their concrete acts

6    against Forte incumbent leadership.

7                    Having pled facts to support a

8    reasonable inference that the board perceived a threat

9    to corporate control, the amended complaint also

10   establishes a pleading-stage inference that the Board

11   took defensive measures in response to that threat.

12                   In considering whether the challenged

13   board measures have a defensive effect, this Court

14   "consider[s] both whether the measures had primarily

15   defensive effects and whether the directors had a

16   subjective intent to act defensively," to quote

17   *Berger*.

18                   The amended complaint alleges the PIPE

19   had defensive effects.  The PIPE made it far more

20   likely that an incumbent would be elected, and it

21   stifled Forte's activist stockholders.  The PIPE was

22   only offered to investors Wagner identified, four of

23   whom were Board members; no activist stockholders were

24   invited to participate.

24

1          After executing the PIPE, the Board

2    set a record date that allowed the PIPE investors to

3    vote in the 2023 election.  The PIPE shares

4    constituted 42% of the shares eligible to vote.  Thus,

5    the activist stockholders experienced 54.1 percent

6    dilution in voting power just days before the record

7    date.

8          Eight of the nine PIPE investors,

9    constituting 11.1 million votes, voted for the two

10   incumbents and voted to extend the rights plan to July

11   2024.  These 11.1 million votes flipped the outcomes.

12   The PIPE had an entrenching or defensive effect.

13          Further the directors had a subjective

14   intent to act defensively, based on Plaintiff's

15   allegations.  A corporation action with collateral

16   effects, including a tendency to preserve incumbent

17   control, is not per se subject to *Unocal* scrutiny, and

18   so Plaintiffs still must allege a subjective

19   motivation to act defensively in response to a

20   perceived threat.

21          The Court may consider all relevant

22   circumstances to discern the directors' motivations,

23   including the timing of the allegedly defensive

24   actions, and whether the allegedly defensive actions

25

1  were otherwise necessary to accomplish a legitimate

2  goal, or there was a clear alternative reason for

3  acting.

4            Defendants seek dismissal on the

5  grounds that the PIPE was solely, or as a fallback,

6  primarily, intended to raise needed capital.  But in

7  view of Plaintiffs' allegations, including multiple

8  instances in which the Board indicated the company

9  would have enough cash to meet its projected needs,

10  this argument offers a competing and disfavored

11  inference that I cannot accept at this stage.

12            The PIPE's defensive effects carry

13  some of the load in supporting an inference that the

14  Board intended it to be defensive.

15            From there, Plaintiff offers more

16  allegations that support the inference that Forte's

17  Board implemented the PIPE with the subjective intent

18  to defend against activist threats.  After every step

19  Forte's dissident stockholders took towards the

20  boardroom, Forte's incumbent directors responded with

21  a defensive measure.

22            Funicular disclosed its tender offer

23  and liquidation discussion with Wagner.  The Board

24  responded with a rights plan with the sole, explicit,

26

1    and disclosed purpose of "discourag[ing] a ... tender

2    or exchange offer."  The activist stockholders rapidly

3    acquired a total of 38.5% of Forte's outstanding

4    common stock.  Forte issued additional shares

5    amounting to roughly 38% of outstanding common stock.

6              Camac sought books and records,

7    indicated its desire to replace the incumbent

8    directors, and disclosed it acquired 8.2% of Forte's

9    outstanding stock.  The Board expanded with an

10   incumbent-appointed director and adopted costly

11   severance agreements in the event of a change in

12   control.  Camac sued for books and records in this

13   Court.  The Board expanded and appointed another

14   director.

15             The Board's pattern of responding to

16   an enemy approach by building fortifications continued

17   with the PIPE.  Camac issued its proxy statement,

18   declaring a vote for its nominees was a "referendum to

19   ... the Board."  The Board delayed the 2023 annual

20   meeting, then announced the PIPE, and then set the

21   record date so PIPE investors could vote in the 2023

22   election.

23             The amended complaint's allegations of

24   the Board's pattern of defensive conduct support a

27

1  reasonable inference that the PIPE was intended as a

2  defensive response to activist threats.    And

3  Plaintiff points to several instances in which the

4  Board was satisfied with Forte's cash on hand, even as

5  it embarked on developing FB-102.

6             At this stage, Camac's allegations

7  support the inference that the PIPE's August 2

8  issuance and August 10 record date were not necessary

9  for Forte's financial stability and that they were

10 intended to entrench the Board.

11            Defendants' cited authorities do not

12 disturb this conclusion.  *Benihana* is a post-trial

13 decision.  In other words, the allegations asserting

14 defensive measures survived the pleading stage, but

15 the plaintiff failed to prove an entrenching motive at

16 trial.  Among other reasons, the Court concluded the

17 board had valid reasons to use equity financing.

18            *Gersahaney, Stroud,* and *Kahn* all

19 expressly lack facts supporting "a reasonable

20 inference that the Director Defendants perceived an

21 actual 'threat.'"  These cases are inapposite here,

22 where Camac has pled facts supporting a reasonable

23 inference of a threat.

24            *In re Ebix* involved measures that both

28

1  did and did not trigger *Unocal* scrutiny.  The bylaw

2  amendments were entrenchment measures related to a

3  potential change in control, even though the board

4  adopted them on a clear day.  Forte did nothing like

5  the director nomination agreement giving board seats

6  to insurgents that *Ebix* concluded was not an

7  entrenchment measure.

8                    The amended complaint supports the

9  plaintiff-friendly inference that the directors

10 initiated the PIPE plan before the 2023 annual meeting

11 with the subjective intent of defending against an

12 activist threat.  Defendants have not argued that the

13 *Unocal* standard is satisfied.

14                    I conclude *Unocal* enhanced scrutiny

15 with a post-*Coster* sensitivity to the stockholder

16 franchise applies at the pleading stage.

17                    Defendants' final argument in favor of

18 dismissal of Count I attacks the remedy Plaintiff

19 seeks.  Defendants contend dismissal is necessary

20 because Camac seeks improper relief.  Defendants have

21 only singled out two of the ten remedies requested,

22 declaring all the institutional investors' votes be

23 excluded and enjoining the institutional investors

24 from voting in 2024.  They completely ignored that

29

1    this Court has "remedial discretion to fashion a

2    different remedy than what the parties have requested

3    when circumstances so require," to quote *PharmAthene*.

4                    "It is true that once the stockholder

5    vote has been held, certain aspects of the harm are

6    irreparable ... [but] the inability to provide

7    fully-adequate equitable relief does not mean that no

8    remedy is awarded," to quote In re *Orchard*

9    *Enterprises*.

10                   Regardless, this discussion is

11   premature at the pleading stage.  "Once a right and a

12   violation have been shown, the scope of [this Court's]

13   equitable powers to remedy past wrongs is broad, for

14   breadth and flexibility are inherent in equitable

15   remedies*," to quote Columbia Pipeline*.  I will not

16   curtail them now.

17                   For the foregoing reasons, Defendants'

18   motion to dismiss is denied as to Count I.

19                   Turning to Count II, Plaintiff raises

20   a derivative claim for wrongful dilution.  Defendants

21   have moved to dismiss Count II under Rule 23.1 and

22   Rule 12(b)(6).

23                   Plaintiff has established demand is

24   futile because a majority of the board faces a

30

1    substantial likelihood of liability under *Zuckerberg*

2    prong II.  Camac asserts "all eight Board members

3    negotiated and approved the PIPE in bad faith for

4    purposes of entrenchment and interference in the

5    stockholder election at the [2023] Annual Meeting, and

6    thus face 'substantial likelihood of liability on any

7    of the claims that would be the subject of the

8    litigation demand.'"

9              Defendants' argument to the contrary

10   relies entirely on its arguments under Rule 12(b)(6),

11   pointing out that, of course, triggering enhanced

12   scrutiny does not automatically excuse demand.

13             Defendants' Rule 12(b)(6) argument as

14   to Count II in turn falls back on their Count I

15   argument, conceding a dilution occurred but contending

16   Plaintiff failed to plead the Defendants acted with a

17   wrongful entrenchment motive, and that without that

18   motive, dilution is not itself wrongful.

19             As explained, Plaintiff pled that the

20   Board perceived a threat and took measures intended to

21   be defensive.

22             In *Benihana,* this Court discussed

23   various factors that have swayed a court in finding a

24   company's stock issuance to be wrongful:  (i) the

31

1    board asserts a need to raise funds but fails to give

2    the plaintiff the opportunity to purchase shares; (ii)

3    "the board approves the issuance of stock in the midst

4    of a proxy fight" allowing the defendants "to

5    virtually assur[e] the outcome of the election of

6    directors;" and (iii) "the haste with which the basic

7    ... transaction was hammered out."

8                    As explained, Plaintiff has alleged

9    with particularity that the Board collectively knew

10   and intended that the PIPE had a purpose other than

11   that of advancing the best interests of the

12   corporation.  Plaintiff asserts, citing internal

13   projections, that Forte did not need increased capital

14   for almost a year after the Board announced the PIPE.

15                   Plaintiff pled facts establishing the

16   Board's habitually defensive response to stockholder

17   activism and the intensity of the activism immediately

18   preceding the PIPE.  Plaintiff further asserts the

19   Defendants did not consider alternative nondilutive

20   means for raising capital.

21                   Additionally, the Board failed to give

22   its significant stockholders an opportunity to

23   purchase shares in the PIPE.  And, the Board did just

24   what *Benihana* called egregious:  It issued stock in

32

1  the midst of a proxy fight, virtually assuring, or at

2  least significantly improving, its victory in the

3  director elections.

4              Finally, a need for capital still does

5  not explain the haste all with which the PIPE was

6  hammered out, or why such a need required the Board to

7  set August 10 as the record date.  Plaintiff has

8  alleged facts matching each of *Benihana*'s examples for

9  what makes a stock issuance wrongful.

10             These facts establish a reasonable

11  inference the Board knew that including an

12  outcome-determinative block of 15.2 million shares to

13  handpicked investors in the August 10 record date was

14  not necessary to Forte's cited financial needs, and

15  instead was designed to dispositively dilute the votes

16  of persistent dissidents who did not have the

17  opportunity to participate in the PIPE.

18             Plaintiff has stated a derivative

19  claim for wrongful dilution, and demand is excused.

20             For those reasons, Defendants' motion

21  is denied.

22             I would ask the parties to collaborate

23  on a scheduling order and submit one to be entered by

24  the Court.

33

1                    Ms. German, is anything unclear?  Do
2      you have any questions at this time?
3                    ATTORNEY GERMAN:  No questions at this
4      time, Your Honor.
5                    THE COURT:  Thank you.
6                    Mr. Alleman, any questions at this
7      time?
8                    ATTORNEY ALLEMAN:  No questions.
9      Thank you, Your Honor.
10                   THE COURT:  All right.  Thank you very
11     much.  We are adjourned.  Take care.
12                   (Proceedings concluded at 3:47 p.m.)
13                         - - -
14
15
16
17
18
19
20
21
22
23
24

34

1                            CERTIFICATE

2

3               I, JEANNE CAHILL, RDR, CRR, Notary

4    Public in the State of Delaware, do hereby certify

5    that the foregoing pages numbered 3 through 33 contain

6    a true and correct transcription of the proceedings as

7    stenographically reported by me at the hearing in the

8    above cause before the Vice Chancellor of the State of

9    Delaware, on the date therein indicated.

10              IN WITNESS WHEREOF I have hereunto set

11   my hand at Wilmington, Delaware, this 19th day of

12   April, 2024.

13

14

15                  /s/ Jeanne Cahill
                  ---------------------------
16                  Jeanne Cahill, RDR, CRR
                    Delaware Notary Public
17               Registered Diplomate Reporter
                  Certified Realtime Reporter
18

19

20

21

22

23

24